720 F.2d 897
 19 ERC 2105, 14 Envtl. L. Rep. 20,016
 ADA-CASCADE WATCH CO., INC., a Michigan non-profit
corporation, Foremost Insurance Company, a Michigan
insurance corporation, Thornapple Association, Inc., a
Michigan non-profit corporation, Cascade Thornapple
Association, Inc., a Michigan non-profit corporation, John
D. Barfuss, Gary Shoup, Tom Brower and Rosa Brower, husband
and wife, Max Smith, William Foreman and Mary Foreman,
husband and wife, and Neil Oosterhouse and Levina
Oosterhouse, husband and wife, Plaintiffs-Appellants, Cross-Appellees,
v.
CASCADE RESOURCE RECOVERY, INC., a Michigan corporation,
Louis Vander Stel and Douglas Fenske,
Defendants-Appellees, Cross-Appellants.
 Nos. 81-1253, 81-1327.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 6, 1982.
Decided Nov. 3, 1983.
 
 Richard J. Quist (argued), Grand Rapids, Mich., for defendants-appellees, cross-appellants.
 Peter W. Steketee (argued), Grand Rapids, Mich., for plaintiffs-appellants, cross-appellees.
 Peter R. Steenland, Jr., Chief, Appellate Section, U.S. Dept. of Justice, Washington, D.C., Lisa Friedman, Michael Murchison, Water and Solid Waste Division A-131, E.P.A., Washington, D.C., amicus curiae.
 Before KEITH and MERRITT, Circuit Judges, and TIMBERS,* Senior Circuit Judge.
 KEITH, Circuit Judge.
 
 
 1
 Petitioner, Ada-Cascade Watch Co., Inc., appeals from a decision by the district court granting summary judgment to the defendants-appellees, Cascade Resource Recovery, Inc., Louis VanderStel, and Douglas Fenske. Ada-Cascade Watch Co., Inc. is a non-profit corporation consisting of an insurance company and private citizens who oppose the construction of the Cascade toxic waste facility. Cascade Resource Recovery, Inc., (Resource Recovery), a Michigan corporation controlled by Douglas Fenske and Louis VanderStel, is to build the toxic waste facility. The purpose of this facility is to dispose of hazardous waste products generated by companies in the area.
 
 
 2
 The appellants assert that the construction of the facility violates the federal Resource Conservation and Recovery Act ("RCRA"). 42 U.S.C. Sec. 6901 et seq. The facility allegedly failed to obtain all the necessary state environmental permits prior to November 19, 1980, as required by the Act. It therefore was not an "existing facility" under Michigan's Hazardous Waste Management Act (Act 64). 1979 Mich.Pub. Acts 64, Mich.Comp.Laws Ann. Sec. 299.501 et seq., and did not qualify for "interim status" under the RCRA. The appellees, however, assert that they had obtained all the necessary permits prior to January 1, 1980.
 
 
 3
 In particular, the appellees maintain that the permit they were issued under the Solid Waste Management Act (Act 641), 1978 Mich.Pub.Acts 641, Mich.Comp.Laws Ann. Sec. 299.401 et seq., was sufficient to enable them to construct the facility. On March 26, 1981, the district court granted summary judgment to Resource Recovery, Fenske, and VanderStel. The court determined that the toxic waste facility had obtained all the necessary state permits, and thus was an existing facility under Act 64. Accordingly, it was entitled to interim status under the RCRA. This appeal followed. For the reasons set forth below, we remand to the district court to dismiss on the grounds of abstention.
 
 I.
 
 4
 In 1977, Cascade Resource Recovery, Inc. announced that it planned to construct a balefill and metallic hydroxide sludge plant in Kent County, Michigan. The proposed development was to be located in rural Cascade Township on a 160 acre parcel within three feet of an unnamed surface stream. This stream flows into the Thornapple River, which runs through a residential community. The river in this area is used for recreational purposes, including swimming, fishing and boating.
 
 
 5
 The proposed facility would dispose of the liquid metallic hydroxide waste generated by the metal plating firms in the area. The plating waste would be treated in two steps. First, the liquid waste would be dewatered in a series of inground sand filteration cells. The liquid portion of the waste would filter through the sand and drain into a holding pond. The waters from the holding pond would be trucked to the Grand Rapids sewer treatment plant, provided it met certain pre-treatment standards. Second, the metallic hydroxide sludge trapped in the sand filters would be periodically collected and placed in burial pits on the site. The pits would be located in clay soil of low permeability. Once they had been filled with the toxic sludge, the pits would be sealed with a clay cap. The sludge may contain chemical deposits of zinc, chromium, cadmium, copper, cyanide, nickel, phenols, and other hazardous substances.
 
 
 6
 During December of 1977, Resource Recovery initially sought licensing for the site under Michigan's sole refuse disposal act, the Garbage and Refuse Disposal Act, 1965 Mich.Pub. Acts 87, Mich.Comp.Laws Ann. Sec. 325.291 et seq. While Resource Recovery's application was being processed, the state legislature enacted a new solid waste and hazardous waste disposal statute, the Solid Waste Management Act (Act 641). This Act became effective January 11, 1979, and was applied to Resource Recovery's license application.
 
 
 7
 The Director of the Department for Natural Resources (DNR), pursuant to Sec. 12 of Act 641, ordered that Resource Recovery's application be submitted and reviewed by the "Interdepartmental Environmental Review Committee", (INTERCOM) and the "Michigan Environmental Review Board", (MERB).[1] Both of these reviewing committees were established by the governor of Michigan pursuant to Executive Order 1974-4 to review major state activities dealing with environmental consequences. Both Resource Recovery and the State of Michigan prepared impact statements as required under the executive order. After two public hearings and two reviews by each committee, both INTERCOM and MERB approved the impact statements as satisfactory.
 
 
 8
 When Resource Recovery initially applied for site approval, Act 87 stated that local control by ordinance was applicable. They subsequently sought a zoning change of the site from Agricultural to Planned Unit Development. The zoning application was repeatedly tabled by Cascade Township pending the outcome of the licensing by the state. After the INTERCOM and MERB reviews, a license to construct the facility was issued on September 20, 1979 under the provisions of Act 641. This permit originally covered only the disposal trenches and not the sand filters and holding pond. However, the permit was later amended in December of 1979 by the DNR to include the entire facility.
 
 
 9
 Construction of the facility began in March of 1980. However, on March 10, the building inspector for Cascade Township issued a stop construction notice to Resource Recovery. Subsequently, the township commenced a lawsuit against the developers which was based on non-compliance with local zoning ordinances, Township of Cascade v. Cascade County Circuit Court, No. 80-30077CE. The suit was dismissed on October 21, 1980, by the trial judge ruling that Act 641 preempted the local township zoning ordinance, building code provisions and waste management ordinance. The case was appealed, and Michigan's Court of Appeals affirmed the decision of the trial court, Township of Cascade v. Cascade Resource Recovery, Inc., 118 Mich.App. 580, 325 N.W.2d 500 (1982).
 
 
 10
 On January 1, 1980, the Michigan legislature enacted the Hazardous Waste Management Act. 1979 Mich.Pub.Acts 64, Mich.Comp.Laws Ann. Sec. 299.501 et seq. This Act was promulgated to "protect the public health and natural resources of the state and to license and regulate persons in removing and disposing of hazardous waste ...."
 
 
 11
 The appellants assert that under this Act, Resource Recovery did not have all the necessary state preconstruction approvals or permits by November 19, 1980, and therefore was not an existing facility under federal law. The appellees, however, contend that they can construct the facility under the Act 641 construction permit regardless of Act 64, because Sections 14 and 16, as amended, of Act 64, state:
 
 
 12
 Sec. 14: The director may issue permits and licenses under this act for existing or proposed disposal facilities and other authorized operations included in this act before adoption of the plan by the commission of natural resources.
 
 
 13
 Sec. 16: A disposal facility in existence on January 1, 1980, or a facility in existence on November 19, 1980, for which approval of construction has been received from the air pollution control commission, shall not be subject to a review of the board or require a construction permit under this act except for an expansion, enlargement, or alteration of the disposal facility beyond its original authorized design capacity or beyond the area specified in the operating license, original construction permit, or other authorization. This subsection does not abridge or alter the effect of a local ordinance, permit requirement, or other requirement on the construction of a disposal facility described in this subsection (emphasis supplied).
 
 
 14
 In addition, Rule 299.6102(m) under Act 64 which defines "existing facility" states:
 
 
 15
 "Existing Facility" means a disposal facility that received all necessary state-issued environmental construction or operating permits before January 1, 1980. Existing facilities also include those disposal facilities which are operating before January 1, 1980, under existing authority and which do not require state-issued environmental construction or operating permits.
 
 
 16
 After Resource Recovery began construction again in October of 1980, the United States Environmental Protection Agency promulgated its rules and regulations under its authority in RCRA, 42 U.S.C. Sec. 6901, et seq. On May 19, 1980, plating waste, pursuant to these rules and regulations was classified as a hazardous waste within the control and regulations of RCRA.
 
 
 17
 Appellants maintain that Resource Recovery was required to get an RCRA permit in order to construct the hazardous waste facility. Resource Recovery maintains, however, that they qualify under 42 U.S.C. Sec. 6925(e) for federal interim status, and therefore can continue to construct without the RCRA permit. Section 42 U.S.C. Sec. 6925(e) as amended, states:
 
 
 18
 Interim Status--Any person who--
 
 
 19
 (1) owns or operates a facility required to have a permit under this section which facility is in existence on or before November 19, 1980,
 
 
 20
 (2) has complied with the requirements of section 6930(a), and
 
 
 21
 (3) has made an application for a permit under this section shall be treated as having been issued such permit until such time as final administrative disposition of such application is made, unless the Administrator or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application.
 
 
 22
 Appellants have not raised the issues presented by (2) and (3). They concede that both of these items were performed by Resource Recovery. Appellants, instead, have consistently argued that Resource Recovery was not "in existence on November 19, 1980." The term "in existence on November 19, 1980", is defined by the E.P.A. in 40 C.F.R. 260.10:
 
 
 23
 "Existing hazardous waste management (HMW) facility" or "existing facility" means a facility which was in operation or for which construction commenced on or before November 19, 1980. A facility has commenced construction if:
 
 
 24
 (a) The owner or operator has obtained the Federal, State and local approvals or permits necessary to begin physical construction; and either
 
 
 25
 (b) (1) A continuous on-site, physical construction program has begun; or (2) The owner or operator has entered into contractual obligations--which cannot be cancelled or modified without substantial loss for physical construction of the facility to be completed within a reasonable time (emphasis supplied).
 
 
 26
 Again, appellants have not sought to challenge (b) of Sec. 260.10 as originally written or amended since they concede that Resource Recovery met these criteria. The issue presented by appellants is whether Resource Recovery had obtained the state approvals or permits necessary to begin physical construction in order to qualify as having commenced construction on or before November 19, 1980. Such construction would qualify the operation as a facility in existence on November 19, 1980. There is no challenge or question that Resource Recovery did commence physical construction prior to November 19, 1980. Appellants challenge whether Resource Recovery commenced construction on or before November 19, 1980 within the framework of Sec. 260.10.
 
 
 27
 Essentially, appellants argue that Resource Recovery had to stop construction because RCRA required a permit to construct a facility designed to accept hazardous waste for disposal. However, Resource Recovery maintains that it qualifies under RCRA 42 U.S.C. Sec. 6925(e) because it had all the necessary state permits. It therefore qualified for federal interim status, and could continue to construct without the RCRA permit.
 
 II.
 
 28
 The central issue in this case is whether the proposed facility had obtained all the necessary state and local permits, thus qualifying for interim status under the RCRA, 42 U.S.C. Sec. 6925(e). Our inquiry thus proceeds to that of state law. Resource Recovery maintains that under Secs. 16 and 18 of Act 64 they are exempt from having to acquire an Act 64 permit, because it is an existing facility under state law. An "existing facility" is not defined in Michigan Act 64, but is defined in an administrative rule adopted by the DNR. Rule 299.6102(m) states: "existing facility means a disposal facility that received all necessary state-issued environmental construction or operating permits before January 1, 1980." Resource Recovery asserts that under this definition they had all the necessary state and local construction permits by January 1, 1980.
 
 
 29
 However, the appellants assert that Rule 299.6102(m), which attempts to exempt the facility from the site approval board review and construction permit requirements, is illegal "because it is inconsistent with the Michigan legislature's clear intention in enacting Section 16 of Act 64." Secondly, they assert that the facility did not have a necessary permit on January 1, 1980 under the Michigan Inland Lakes and Streams Act. Mich.Comp.Laws Ann. Sec. 281.951, et seq.
 
 
 30
 In addressing appellants' contentions, we note that both Act 64 and the administrative rule adopted by the DNR were promulgated by the state or state-created agency. As such, whether there exists an inconsistency between the Rule and the Act, is a question of State law. As to the second contention, the appellants are asking this court to disagree with the State agency's conclusions as to what permits are necessary under state law to begin construction of a hazardous waste facility. For the reasons set forth below, we find that abstention is required.
 
 III.
 
 31
 Abstention is a judicially created exception to the general grant of jurisdiction set forth in Article III of the Constitution. See Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The doctrine permits federal courts to decline or postpone the exercise of jurisdiction so that a state court will have the opportunity to decide the matters at issue. Colorado River Water Conservation District v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483, reh'g denied, 426 U.S. 912, 96 S.Ct. 2239, 48 L.Ed.2d 839 (1976). However, abstention is an extraordinary and narrow exception to the duty of federal courts to adjudicate controversies which are properly before it. Id. The Supreme Court has emphasized that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." Colorado River Conservation District, 424 U.S. at 813, 96 S.Ct. at 1244, quoting County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188-89, 79 S.Ct. 1060, 1062-63, 3 L.Ed.2d 1163 (1959). Abstention is justified only where the "order to the parties to repair to the state court would clearly serve an important countervailing interest." Id.
 
 
 32
 There are three generally recognized categories of abstention. See Colorado River Conservation District, 424 U.S. at 814, 96 S.Ct. at 1244. Each category represents a set of circumstances which justify a federal court abstaining from adjudicating a case properly before it.
 
 
 33
 The first and oldest form of abstention was judicially created in Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). There the Supreme Court held that abstention may be appropriate where the resolution of uncertain state law issues could moot a federal constitutional issue or cause it to be presented in a different posture. Id. at 501, 61 S.Ct. at 645. See Colorado River Conservation District, 424 U.S. at 814, 96 S.Ct. at 1244; County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959). Accord United States v. Anderson County, Tennessee, 705 F.2d 184 (6th Cir.1983); Martin-Marietta Corp. v. Bendix Corp., 690 F.2d 558, 563 (6th Cir.1982); Hanna v. Toner, 630 F.2d 442, 445 (6th Cir.), cert. denied, 450 U.S. 919, 101 S.Ct. 1365, 67 L.Ed.2d 346 (1980). Deferral to the state courts, however, is not appropriate merely because the state law issues are novel and critical to the case. See BT Investment Managers, Inc. v. Lewis, 559 F.2d 950, 954 (5th Cir.1977). The state issue must exhibit the qualities of uncertainty and ambiguity. See Wisconsin v. Contantineau, 400 U.S. 433, 438-39, 91 S.Ct. 507, 510-11, 27 L.Ed.2d 515 (1971); Colorado River Conservation District, 424 U.S. at 815, 96 S.Ct. at 1245.
 
 
 34
 The second category of abstention stems from Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Younger abstention is based on comity, that is, "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." Id. at 44, 91 S.Ct. at 750. In Younger, the Supreme Court held that absent extraordinary circumstances, a federal court is precluded from enjoining a pending state criminal proceeding.[2] Recently the Court has declared that the label "civil, quasi-criminal" was not the critical factor governing the appropriateness of Younger abstention. The factor is whether the federal court's intervention would unduly interfere with the legitimate activities of the state. Juidice v. Vail, 430 U.S. 327, 335-36, 97 S.Ct. 1211, 1217-18, 51 L.Ed.2d 376 (1977); Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423, 102 S.Ct. 2515, 2521-22, 73 L.Ed.2d 116 (1982). In Middlesex County Ethics Committee, the Court articulated the following three-prong test for determining when Younger abstention is appropriate in non-criminal proceedings: 1) Are there ongoing state judicial proceedings;[3] 2) Do the proceedings implicate important state interests;[4] and 3) Is there an adequate opportunity in the state proceedings to raise constitutional challenges. 102 S.Ct. at 2522; U.S. v. Anderson Co., 705 F.2d 184 (6th Cir.1983).
 
 
 35
 The final category, of abstention, Burford abstention, derives its name from Burford v. Sun Oil Company, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). There the Court upheld abstention where the "exercise of federal review of the [state law] question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." Colorado River Water Conservation District, 424 U.S. at 814, 96 S.Ct. at 1245. In Burford, the Texas legislature had centralized the administration of a regulatory scheme for oil and gas in one agency, with judicial review in a single state district court in Travis County, Texas. Burford, 319 U.S. at 325-26, 63 S.Ct. at 1103-04. The federal courts inconsistently interpreted state law which required a specialized knowledge of oil and gas matters. This resulted in uncertainty and confusion in the state's conservation program. The Court found that these circumstances justified abstention and dismissed the action. Id. at 324, 327-31, 63 S.Ct. at 1102, 1104-06.
 
 
 36
 The Burford abstention, however, is not appropriate "merely because resolution of a federal question may result in the overturning of a state policy." Zablocki v. Redhail, 434 U.S. 374, 380 n. 5, 98 S.Ct. 673, 678 n. 5, 54 L.Ed.2d 618 (1978); Colorado River Conservation District, 424 U.S. at 815-16, 96 S.Ct. at 1245-46. The State must exhibit an overriding interest in the subject matter. BT Investment Managers Inc., 559 F.2d at 955. Additionally, the state must centralize review in a forum with special competence. See Nasser v. City of Homewood, 671 F.2d 432, 440 (11th Cir.1982). The key question is whether an erroneous federal court decision could impair the state's effort to implement its policy. Turf Paradise, Inc. v. Arizona Downs, 670 F.2d 813, 820 (9th Cir.), cert. denied, 456 U.S. 1011, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982); BT Investment Managers Inc., 559 F.2d at 955.
 
 
 37
 In the present case, the Pullman doctrine is inapplicable. The federal courts abstain under the Pullman doctrine when there are uncertain issues of state law which could moot or cause a federal constitutional issue to be presented in a different posture. No such uncertain state law exists in this case, and there is no federal constitutional issue which could be presented in a different posture. The Younger v. Harris doctrine is also inapplicable to this case. The Younger doctrine is applied when there is a state criminal proceeding pending, or as recently enunciated in Middlesex, supra, if the three-prong test is met. Here neither requirement for Younger abstention is met. We therefore find that the present case falls within the standards enunciated in the Burford doctrine, Burford v. Sun Oil Company, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).
 
 IV.
 
 38
 In Burford, the Supreme Court enunciated two factors which justify abstention. First, the presence of a complex state regulatory scheme which would be disrupted by federal court review; and, secondly, the existence of a state-created forum with specialized competence in the particular area. Burford, supra at 327, 332-33, 63 S.Ct. at 1104, 1106-07. In Burford, the Court found that the complex state system for regulation of the oil industry involving administrative decision-making and judicial review should be allowed to function without continual interference from the federal courts. The Court noted that "delay, misunderstanding of local law, and needless federal conflict with the state policy would be the inevitable product of this double system of review." 319 U.S. at 327, 63 S.Ct. at 1104. The federal courts have adhered to this policy of non-interference in state administrative matters. This is particularly so when the state regulation involves matters of substantial state concern, and are part of a statutorily established regulatory program by state officials. See, e.g., Alabama Public Service Commission v. Southern Railway, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) (state regulation of intrastate railroad passenger service); Kelly Services, Inc. v. Johnson, 542 F.2d 31 (7th Cir.1976) (state regulation of employment agencies); Smith v. Metropolitan Property and Liability Insurance Co., 629 F.2d 757 (2d Cir.1980) (state regulation of insurance companies).
 
 
 39
 The State of Michigan has an overriding interest in the protection of its environment from the effects of unregulated hazardous wastes. This overriding interest is manifested in the state's implementation of a vigorous and complex administrative procedure for the approval of construction of hazardous waste facilities. In 1973 the state created the Department of Natural Resources ("DNR") by Executive Orders 1973-2 and 1976-1. This department was designated the "state entity responsible for the development and coordination of all environmental functions and programs of Michigan." Mich.Comp.Laws Ann. Sec. 299.11. Of particular relevance to this case are the rules and regulations which monitor the construction of hazardous waste facilities. The essence of this system is the permit approval process which we briefly review below.
 
 
 40
 The Hazardous Waste Management Act, 1979 Mich.Pub. Acts 64, Mich.Comp.Laws Ann. Sec. 299.501 et seq. (Act 64) is the cornerstone of the protection of the environment from hazardous waste in Michigan. It was promulgated for the purpose of "[p]roviding hazardous waste management facilities to develop a plan for the safe management and disposal of hazardous wastes; and to consider waste management and disposal needs of this state ...." Mich.Comp.Laws Ann. note preceding Sec. 299.501. Under Sec. 18 of Act 64 a permit is required to construct a new facility for disposal, treatment, or long term storage of hazardous wastes. A permit applicant is required to include with the application a description of hydrogeology, an environmental and engineering assessment plan, and a procedure for closure and post-closure monitoring. Mich.Comp.Laws Ann. Secs. 299.518, 540. An application must also include an assessment of the environmental impacts of the facility during both normal operations and "failure modes." Mich.Comp.Laws Ann. Sec. 299.518. The failure mode assessment must describe and analyze the "potential major methods by which safe handling of hazardous wastes may fail at a disposal facility." Mich.Comp.Laws Ann. Sec. 299.503.
 
 
 41
 Additionally, if the proposal is for a major or controversial project, it may necessitate the preparation of an environmental impact statement by the DNR under Executive Order 1974-4. Cascade Resource Recovery was required to submit an impact statement under this provision. It was reviewed by INTERCOM and MERB, with both groups recommending approval.
 
 
 42
 Once an application for construction is received, the DNR must publish a notice in local newspapers and directly notify the affected municipality and county. Mich.Comp.Laws Ann. Sec. 299.519. The DNR must also review the proposal for its potential effects on air quality, waste management and hydrogeology. Unless the DNR rejects the application within seventy-five (75) days of receipt, the Director must initiate a site review process by notifying the site approval board. Mich.Comp.Laws Ann. Sec. 299.520. The site approval board is comprised of five standing members who participate in all site reviews. These permanent members include a representative from the departments of public health, state police, natural resources, and a geologist and a chemical engineer appointed by the governor. Mich.Comp.Laws Ann. Sec. 299.517. The remaining four positions on the board are appointed on an ad hoc, temporary basis by the local governments of the site area. Concurrence of five members constitutes a legal action of the board.
 
 
 43
 The board's review procedures are enunciated in Sec. 20 of the Act. Mich.Comp.Laws Ann. Sec. 299.520. In its deliberations on the proposal, the board must consider, at a minimum, the risk and impact of transportation accidents, ground and surface water contamination, and fires or explosions from improper handling of wastes. Additionally, the board must consider the impact on health and safety and consistency with local planning and existing development. The Board must also evaluate the potential relationship of local ordinances, permits, and other requirements to the proposed facility, and to the fullest extent possible, integrate these local requirements in the permit by stipulation. Mich.Comp.Laws Ann. Sec. 299.520.
 
 
 44
 In regard to the environmental impact, the board is to include the "specification of the predictable adverse effects on the following: (i) the natural environment and ecology, (ii) public health and safety, (iii) scenic, historic, cultural and recreational value, (iv) water and air quality, and wildlife." Mich.Comp.Laws Ann. Sec. 299.520(7)(e).
 
 
 45
 Finally, the board must evaluate measures to mitigate any adverse effects, and "facilitate efforts" to provide that concerns and objections of the public are mitigated through additional stipulations in the permit. Mich.Comp.Laws Ann. Sec. 299.520(8), (7)(f). After approval or rejection by the site board, the DNR shall issue or deny the permit according to the board's decision. Mich.Comp.Laws Ann. Sec. 299.521. The department shall also issue along with the hazardous waste permit any other DNR permits required of the facility and described in the note of intent.
 
 
 46
 It should be noted that once the approval process has been completed, the facility is required to obtain an operating license. Mich.Comp.Laws Ann. Sec. 299.522. This requires that an operation have an engineer certify that the site was constructed in accordance with the specifications of the construction permit. Mich.Comp.Laws Ann. Sec. 299.522. Prior to the issuance of an operating license, a DNR staff member must inspect the site to determine whether it complies with the Act, the state hazardous waste management plan, DNR rules, and the stipulation of the construction permit. Mich.Comp.Laws Ann. Sec. 299.523.
 
 
 47
 This overview of the permit approval process evinces that the state has developed a complex and systematic process to evaluate facilities which will have an impact on the environment. This permit process enables the state to implement a consistent and coherent state policy toward hazardous waste facilities in the state.
 
 
 48
 Moreover, the centralization of judicial review is a major factor in determining the state's desire for a coherent public policy. Burford, 315 U.S. at 325, 63 S.Ct. at 1103, supra; Alabama Public Service Commission, 341 U.S. at 348, 71 S.Ct. at 767; Educational Services, Inc. v. Maryland State Board for Higher Education, 710 F.2d 170, 173 (4th Cir.1983). The State of Michigan has manifested its desire to create a coherent policy in hazardous waste management by centralizing judicial review in Ingham County Circuit Court.[5] Mich.Comp.Laws Ann. Sec. 299.548. This centralization ensures that the state policy will be consistent by enabling the Ingham Court to develop expertise in the environmental area. The premise underlying the Burford doctrine, which is applicable in this case, is that the "very act of review by a court other than the one purposely made familiar with the particularly complex resource regulation issues involved would upset a carefully crafted and integrated system." See Alabama Public Service Commission v. Southern Railway, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); Colorado River Conservation District, supra.
 
 
 49
 We find that the State of Michigan has a complex system of permit review and approval process for hazardous waste facilities. The appellants essentially request that we review two provisions of state law which are an integral part of this complex system of review. They request that we find these provisions, Rule 299.6102(m) and Section 16 of Act 64, inconsistent, and therefore illegal. These provisions were both promulgated by the State of Michigan and, as such, are questions of state law.
 
 
 50
 Additionally, the appellants would have us second-guess a state agency in its determination that no other permits were necessary to construct a hazardous waste facility. As the Supreme Court stated in Colorado River Water Conservation District, 424 U.S. at 813, 96 S.Ct. at 1244, "[I]t is enough that exercise of federal review of the question in this case and similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial concern." Id. This Court is ill-equipped to review state rules and regulations which have an entirely local effect. To do so would be unnecessary and a disruptive interference into the local affairs of the State of Michigan. Appellants should be allowed to challenge in state court the administrative ruling that, because all necessary permits had been granted, the waste disposal plant was properly licensed as an "existing facility." Adhering to the mandate enunciated in Burford, supra, we abstain from deciding the issues presented by the appellants and remand to the district court with instructions to dismiss the action on grounds of abstention consistent with this opinion.
 
 
 51
 MERRITT, Circuit Judge, dissenting.
 
 I.
 
 52
 Plaintiffs are suing the present defendants under the citizen suits provision of the RCRA, 42 U.S.C. Sec. 6972, which creates a private right of action against alleged violators of the Act. The District Court did not abstain but reached the merits of the federal question and dismissed the complaint on defendants' Motion to Dismiss, which the court treated as a Motion for Summary Judgment.
 
 
 53
 The District Court's decision followed from its finding that defendants' facility qualified for "interim status" as a "facility ... in existence on November 19, 1980" under 42 U.S.C. Sec. 6925(e) and was therefore exempt from the permit requirement cited in plaintiffs' complaint.[1] In order to arrive at this conclusion, the District Court had to find that defendants' project was an "existing facility" under the statute. The Environmental Protection Agency (EPA) has defined "existing facility" in 40 C.F.R. Sec. 260.10 (1982), the relevant portion of which reads as follows:
 
 
 54
 "Existing hazardous waste management (HWM) facility" or "existing facility" means a facility which was in operation or for which construction commenced on or before November 19, 1980. A facility has commenced construction if:
 
 
 55
 (1) The owner or operator has obtained the Federal, State and local approvals or permits necessary to begin physical construction....
 
 
 56
 Thus, the question whether defendants' facility was entitled to "interim status" hinged on defendants' ability to demonstrate satisfaction of all applicable federal, state, and local permit requirements. Noting that the state agency in charge of enforcing Michigan's environmental laws had informed defendants that they did not need to obtain any additional construction permits, the District Court held that defendants had met the condition contained in the "existing facility" definition.
 
 
 57
 On appeal, plaintiffs contend that the District Court erroneously failed to investigate the correctness of the state agency's determination that no additional construction permit was required under state law. I do not believe that the District Court had jurisdiction to decide the merits of the case because the plaintiffs have not satisfied jurisdictional conditions placed on their right to sue under the RCRA. I do not agree with the majority that this is a proper case for abstention.
 
 II.
 
 58
 The citizen suits provision of the RCRA, 42 U.S.C. Sec. 6972(b)(1), imposes an explicit, clearly stated condition on the private right of action that the statute creates against both public and private defendants for violation of the Act:
 
 
 59
 No action may be commenced ... prior to sixty days after plaintiff has given notice of the violation (A) to the Administrator [of the EPA]; (B) to the State in which the alleged violation occurs; and (C) to any alleged violator of ... [an RCRA] permit, standard, regulation, condition, requirement or order....
 
 
 60
 (emphasis added). In the instant case, plaintiffs did not give the requisite notices. They sent notice to all defendants (including those subsequently dismissed)[2] on November 21, 1980, and filed suit a week later on December 1, 1980. They thus failed to comply with the sixty-day notice requirement. This provision is jurisdictional in nature affecting the power of the court to adjudicate the claim, and accordingly the plaintiffs' failure to observe it compels dismissal of their case.
 
 
 61
 The District Court dealt with the notice provision by staying all action on the case for sixty days from the date plaintiffs gave notice of the alleged violations. The Court reasoned that because the complaint was served on all the parties who were required to be notified under the statute, they had notice of the violation and the intent of the sixty-day notice requirement would be satisfied if the Court refrained from acting for sixty days to give the parties time to consider what action if any to take regarding the alleged violations.
 
 
 62
 There is a split in the Circuits on the so-called "pragmatic approach" to the problem of construing this provision and the similar notice requirements contained in other federal environmental statutes.[3] For example, in Pymatuning Water Shed Citizens v. Eaton, 644 F.2d 995 (3d Cir.1981), the Third Circuit approved the District Court's decision to stay proceedings in a citizen suit under the Federal Water Pollution Control Act (FWPCA) until the sixty-day notice period had elapsed, rather than dismiss the case. See also Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor, 619 F.2d 231, 243 (3d Cir.1980), cert. denied sub nom. General Public Utilities Corp. v. Susquehanna Valley Alliance, 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981); Natural Resources Defense Council, Inc. v. Train, 510 F.2d 692, 703 (D.C.Cir.1974) (notice provision of FWPCA held not jurisdictional prerequisite); Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, 508 F.2d 927 (2d Cir.1974) (sixty-day notice provision does not erect absolute barrier to earlier suit by citizens).
 
 
 63
 On the other hand, in City of Evansville, Indiana v. Kentucky Liquid Recycling, 604 F.2d 1008 (7th Cir.1979), the Seventh Circuit held that plaintiff's failure to comply with the notice provision of the FWPCA precluded reliance on the citizen suits provision of the Act as a jurisdictional basis for the action. Accord Commonwealth of Massachusetts v. United States Veterans Administration, 541 F.2d 119 (1st Cir.1976).
 
 
 64
 In this Circuit, the only other case addressing a statutory notice issue is Pinkney v. Ohio Environmental Protection Agency, 375 F.Supp. 305 (N.D.Ohio 1974), in which the District Court held that the notice provision of the Clean Air Act, 42 U.S.C. Sec. 1857, constitutes a jurisdictional prerequisite.
 
 
 65
 I believe that the Pinkney court's interpretation of the notice provision of the Clean Air Act should be applied to citizen suits under the RCRA. The statute states unambiguously that "no action may be commenced" against private defendants without sixty days notice. Compliance with this notice provision is an indispensable condition on the plaintiffs' right to sue under the Act.
 
 
 66
 Logical construction of the statute dictates that the notice condition be considered a bar to adjudication of the claim. The notice requirement is not a mere technical wrinkle of statutory drafting or formality to be waived by the federal courts. As the Department of Justice points out in its brief as amicus curiae, section 6972(c) contains an explicit exception to the sixty-day notice requirement, an exception that authorizes an action against the Administrator immediately after notice is given, provided the action alleges violation of the Hazardous Waste Management provisions of the RCRA, 42 U.S.C. Sec. 6912 et seq.[4]
 
 
 67
 Although the legislative history does not discuss the purposes of the notice requirement, this provision and its exception rest on readily discernible policy grounds that reflect the fundamental institutional relationship between the specialized administrative agencies and the federal courts. As noted above,[5] there are at least eight environmental statutes--beginning with the Clean Air Act of 1970--that condition a broadly worded private right of action on the plaintiffs' having given prior administrative notice of the activities they believe violate the Act. The widespread occurrence of such a notice requirement demonstrates that the provision was intended to be taken seriously. See Note, Notice by Citizen Plaintiffs in Environmental Litigation, 79 MICH.L.REV. 299 (1980) (Clean Air Act notice provision is jurisdictional prerequisite).
 
 
 68
 The notice requirement serves first to give the Administrator of the EPA and the state an opportunity to investigate the alleged violation, and then take a position on the plaintiff's claims. Lawsuits of this type frequently involve problems arising from the promulgation, interpretation, and application of minimal environmental standards to promote a national policy. The resolution of such problems often demands scientific and technological sophistication that the federal courts are institutionally incapable of developing without expert assistance. The sixty-day notice requirement thus serves the crucial function of putting the environmental problems before the environmental agency in the first instance, where a fund of specialized knowledge and procedures will help evaluate claims of violations. Thereafter, a private citizen may invoke the power of the federal courts, where the institutional expertise of the EPA will be readily available to assist in the resolution of the dispute. Cf. Oscar Mayer & Co. v. Evans, 441 U.S. 750, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979) (plaintiff claiming violation of Age Discrimination in Employment Act of 1967 must seek relief from appropriate state administrative agencies before bringing suit in federal court).
 
 
 69
 Moreover, conditioning the accrual of a private right of action on prior notice gives the parties and the administrative authorities an opportunity to reach an accommodation of their individual grievances through compromise or arbitration, before requiring the federal courts to declare the rights of the parties. By enacting the sixty-day notice provision, Congress intended to encourage resolution of disputes outside the courts, and to secure the participation of the EPA in certain suits. If a court merely stays an action for sixty days after it is filed, there is little incentive for the plaintiffs to seek alternative methods of resolving their disputes. Positions may have hardened, lawyers employed and legal fees paid. Furthermore, under the threat of an impending lawsuit, the Administrator and state may have less room for maneuver and compromise.
 
 
 70
 The function of the sixty-day notice requirement in the enforcement scheme is thus too important to be labeled a mere "formality." This explicit requirement must be enforced if the administrative agencies and the courts are to function in ways best suited to their institutional capacities. Plaintiffs must notify the Administrator, the state and the alleged violators first, and allow the sixty-day period to elapse just as the statute says ("no action may be commenced") before they are entitled to come to court on their own behalf under section 6972.
 
 III.
 
 71
 I do not agree that so-called "Burford" or any other type of abstention is appropriate and the Court's ruling to this effect is simply an effort to avoid deciding the federal jurisdictional and statutory construction issues clearly present in the case. There is no pending, contemplated or other possible state court proceeding for us to abstain in favor of. The state trial and appellate courts have already ruled on the state law issues, as the majority recognizes in Part I of its opinion, and this decision is final and conclusive on these issues. Thus the only question remaining, other than the jurisdictional issue, is whether the facility acquired "interim status" and thus is "grandfathered" in under 42 U.S.C. Sec. 6925(e). This is a federal question. I do not see how we can properly abstain when there is nothing left to be done in the state court. The majority is giving up on the issues rather than abstaining according to governing legal principles. Federal law does not permit its judges to give up rather than decide a case according to law.
 
 
 
 *
 Hon. William H. Timbers, Senior Circuit Judge, United States Court of Appeals for the Second Circuit, sitting by designation
 
 
 [1]
 These committees were established:
 To provide advice to the Governor and state agencies on environmental issues.... To assist the Governor in reviewing federal and state environmental impact statements and to identify actions of state agencies that should be suspended or modified if such actions should seriously threaten the quality of the environment or human life. Executive Order 1974-4 (May 3, 1974).
 
 
 [2]
 In Younger, the Supreme Court clearly left open the possibility of federal injunctive relief against a pending state court proceeding in certain exceptional circumstances: 1) Where irreparable injury is both "great and immediate", Younger, 401 U.S. at 46, 91 S.Ct. at 751; 2) Where the state law is "flagrantly and patently violative of express constitutional prohibitions", Id. at 53, 91 S.Ct. at 755; and 3) Where there is a showing of "bad faith, harassment, or other unusual circumstances that would call for equitable relief". Id. at 54, 91 S.Ct. at 755. Accord Middlesex County Ethics Committee, 102 S.Ct. at 2523
 
 
 [3]
 It is not material whether the state judicial proceedings were initiated before or after the federal proceedings. Younger principles apply where the state proceedings are begun before "any proceedings of substance on the merits have taken place in federal court." Younger, 401 U.S. at 49, 91 S.Ct. at 753; Middlesex, 102 S.Ct. at 2524
 
 
 [4]
 The state interest prong of the Middlesex test would appear to be met where, for example: 1) the state has set up a comprehensive statutory program for the administration and enforcement of its health-care services, Women's Community Health Center of Beaumont v. Texas Health Facilities Commission, 685 F.2d 974, 979 (5th Cir.1982); 2) an agency of the state supreme court has brought an action to assure "the professional conduct of the attorneys it licenses", Middlesex, 102 S.Ct. at 2523; and 3) a state agency has brought an action to safeguard the fiscal integrity of its public assistance programs. Trainor v. Hernandez, 431 U.S. 434, 444, 97 S.Ct. 1911, 1918, 52 L.Ed.2d 486 (1977)
 
 
 [5]
 An action can also be brought in the county in which the defendant is located, resides, or is doing business, Mich.Comp.Laws Ann. Sec. 299.548
 
 
 [1]
 This "grandfather provision" of 42 U.S.C. Sec. 6925(e), as amended, reads in part as follows:
 Interim status.--Any person who--
 (1) owns or operates a facility required to have a permit under this section which facility is in existence on November 19, 1980,
 * * *
 shall be treated as having been issued such permit until such time as final administrative disposition of such application is made, unless the Administrator or other plaintiffs proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application.
 
 
 [2]
 See supra note 1
 
 
 [3]
 See, e.g., Toxic Substance Control Act, Secs. 20, 21, 15 U.S.C. Secs. 2619, 2620 (1976); Surface Mining Control and Reclamation Act of 1977, Sec. 520, 30 U.S.C. Sec. 1270 (1976 & Supp. I); Marine Protection, Research, and Sanctuaries Act of 1972, Sec. 105, 33 U.S.C. Sec. 1415 (1976); Deepwater Port Act of 1974, Sec. 16, 33 U.S.C. Sec. 1515 (1976); Safe Drinking Water Act, Sec. 2(a), 42 U.S.C. Sec. 300j-8 (1976 & Supp. I); Noise Control Act of 1972, Sec. 12, 42 U.S.C. Sec. 4911 (1976); Resource Conservation and Recovery Act of 1976, Sec. 2, 42 U.S.C. Sec. 6972 (1976 & Supp. I); Clean Air Amendments of 1970, Sec. 12(a), 42 U.S.C. Sec. 7604 (1976 & Supp. I)
 
 
 [4]
 The instant case now involves only private defendants. Thus, plaintiffs cannot avail themselves of this exception to the notice requirement
 
 
 [5]
 See supra note 3