843 F.2d 1391
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Nos. 86-1004, 86-1032.
 
 Henry M. HUNTER, Helen Hunter, George Clasby, Beverly
Bristow, Linda Gusek, Jim Hope, Rosemary Kanuha, Jeanette
Shand, Sylvia Strauss, Marie Novak, Jointly and Severally,
Plaintiffs-Appellees, Cross-Appellants,
v.
SMS, INC., A Michigan Corporation, Ilene R. Moses and the
Board of Directors of SMS, Inc., Jointly and
Severally, Defendants-Appellants,
Cross-Appellees.
 United States Court of Appeals, Sixth Circuit.
 April 6, 1988.
 Before ENGEL and BOGGS, Circuit Judges, and JOHN D. HOLSCHUH, District Judge.*
 PER CURIAM.
 
 
 1
 This diversity action arises from sales or purported sales of stock in a Michigan corporation and is governed by the law of Michigan. Defendants appeal from a judgment in favor of plaintiffs for $625,000, entered pursuant to a jury verdict for that amount, and from the order of the district court denying defendants' motion to alter or amend the judgment. Plaintiffs cross-appeal, in the event the judgment below is reversed and a new trial is ordered, from an order of the district court granting defendants' motion for partial summary judgment with respect to a claim in the third amended complaint which sought a dissolution of the Michigan corporation in question.[1]
 
 
 2
 For the reasons hereafter stated, the judgment in favor of plaintiffs on the jury's verdict is REVERSED; the order granting partial summary judgment dismissing the claim for dissolution on abstention grounds is AFFIRMED, and this action is REMANDED for a new trial consistent with this opinion.
 
 I.
 
 3
 Due to the confusing nature of this case, it is necessary to set forth a detailed recitation of the circumstances under which this appeal is presented. In 1974, defendant Ilene Moses formed a Michigan corporation named Saint Michel Sportique, Inc. (St. Michel), which was engaged in manufacturing women's fashion wear. Plaintiffs Henry and Helen Hunter were among the original investors of St. Michel, investing $12,500 for 250 shares of stock.
 
 
 4
 On April 30, 1976, St. Michel was dissolved by a vote of its shareholders. Ilene Moses formed a new corporation, SMS, Inc. (SMS), to be the successor corporation to St. Michel. Ms. Moses is and has been at all times the president and principal shareholder of SMS. When St. Michel transferred its assets to SMS, Henry and Helen Hunter were issued a stock certificate for 250 shares of SMS stock, the same number of shares they had held in the predecessor corporation. Henry Hunter later became a director of SMS.
 
 
 5
 Subsequent to its formation, SMS required additional capital, and solicitations were made for new shareholders. Henry and Helen Hunter helped to solicit investments from several of their acquaintances on behalf of the corporation. According to plaintiffs, the plan for capitalization was that a total of 4,000 shares would be issued and that investors would be invited to purchase blocks of stock wherein they would receive two and one-half percent of the total number of available shares for every $5,000 invested. Henry and Helen Hunter personally invested an additional $7,500 in SMS. Plaintiffs are a group of individuals, including the Hunters, who invested a combined sum of $62,500 in SMS. They currently hold certificates purporting to represent 2350 shares of SMS stock and claim that an outstanding certificate is due them for 150 shares, bringing their total number of shares in SMS to 2500.
 
 
 6
 When plaintiffs tendered payment for their purchase of stock in SMS, they received letters from Ilene Moses acknowledging receipt of their funds. According to Henry Hunter, Ms. Moses made repeated representations to plaintiffs that the price of the stock offered was to be $25 per share. Plaintiffs also understood that some of the stock was to be "umbrellaed," that is, issued in the name of one investor to be held on behalf of another. Several months after making their respective investments, plaintiffs received "what purported to be" certificates of stock in SMS. The number of shares listed on the certificates conformed to plaintiffs' understanding that they had received one share of stock for each $25 they invested. Although defendant Moses testified that in her view plaintiffs became bona fide shareholders at the time she acknowledged receipt of their investments, plaintiffs testified that they were never notified of shareholder meetings and were not asked to participate in the election of directors.
 
 
 7
 Some time after plaintiffs' investments, defendant Moses indicated her desire to buy out each of the minority SMS shareholders. Believing that the price offered was inadequate, plaintiffs instituted this action, as shareholders, alleging breach of fiduciary duty by the majority shareholders and breach of a shareholders' agreement.
 
 
 8
 During the discovery phase of this action, plaintiffs learned that their ownership of stock had never been recorded in the corporate records, that the corporate attorney was unaware of the existence of their stock, that stock had been sold to them for a price different than other stock was sold by the corporation, and that the corporate books listed their stock certificate numbers as owned by other persons. Plaintiffs then dismissed their original breach of fiduciary duty claim and asserted claims based upon the common law tort of fraudulent misrepresentation in the sale of stock. Plaintiffs asserted that defendants had made two basic misrepresentations: (1) that the price of the stock was $25 per share when equivalent stock was in fact sold to other persons for $50 per share, and (2) that they would be bona fide shareholders in SMS when in fact all they received for their investments were unauthorized, forged stock certificates.
 
 
 9
 When plaintiffs added their claims for misrepresentation, defendants counterclaimed, seeking rescission of certain of the stock certificates held by plaintiffs on the ground that those certificates were obtained by fraud or mutual mistake. Defendants sought return of one half of the stock certificates held by plaintiffs on the basis that rather than holding 2500 shares of stock for $25 per share as plaintiffs asserted, plaintiffs really held only 1250 shares of stock at the correct price of $50 per share. The district court dismissed plaintiffs' claim for breach of a shareholders' agreement, leaving only their claims for fraudulent misrepresentation.[2]
 
 
 10
 Plaintiffs next amended their complaint to add a claim for dissolution of SMS on behalf of minority shareholders for oppressive conduct by majority shareholders. When the district court dismissed this claim, the dismissal being based on the doctrine of judicial abstention, plaintiffs filed the same claim as a state court action in the Wayne County, Michigan Circuit Court, where the claim remains pending. In that action plaintiffs claim to be "legal or equitable owners" of common stock in SMS.
 
 
 11
 Plaintiffs' misrepresentation claims and defendants' rescission counterclaim proceeded to trial. Plaintiffs' theory at trial was that they were fraudulently induced with promises of stock ownership to contribute money to SMS and received in exchange worthless pieces of forged paper which purported to be stock certificates. Plaintiffs advanced various reasons why they never became "true" shareholders in the corporation, including the fact that bona fide shares of stock were not sold for $25 per share and the fact that their stock certificates were issued after all of the 4000 authorized shares had already been sold. At the close of plaintiffs' evidence and again at the close of all the evidence, defendants moved for a directed verdict, which motion was denied. The jury returned a verdict for plaintiffs in the amount of $625,000, or ten times the amount of their initial investment. According to defendants, the trial judge met with counsel in chambers following the jury's verdict and indicated that he would not rule on defendants' counterclaim, because the jury by its verdict had determined that plaintiffs were never SMS shareholders and the counterclaim issue regarding the correct number of shares to which they were entitled was therefore moot.[3] Thereafter, the trial judge entered a judgment for plaintiffs in the amount of the jury's verdict and further ordered that all stock certificates held by plaintiffs shall be returned to defendants upon satisfaction of the judgment, "and upon surrender of plaintiffs' shares/stock certificates of SMS, Inc., plaintiffs' ownership shall cease."
 
 
 12
 Defendants have appealed from the judgment, raising four issues on appeal: (1) that the trial court erred in refusing to direct a verdict against all plaintiffs; (2) that the trial court erred in refusing to direct a verdict against those plaintiffs who did not appear at trial; (3) that the trial court erred in refusing to direct a verdict against plaintiffs because of certain judicial admissions; and (4) that the trial court erred in its instructions to the jury on the issue of damages. Plaintiffs cross-appeal on the issue of the propriety of the district court abstaining from hearing their claim, as minority shareholders, for dissolution of SMS.
 
 II.
 
 13
 Before addressing the merits of the issues raised on appeal, we believe it would be beneficial to the parties and to the district court upon retrial of this action to preface our discussion of the merits with certain observations. The Court believes that the primary reason for the considerable confusion in this case both at the trial level and on appeal is the uncertain and seemingly inconsistent positions asserted by the parties throughout this litigation.
 
 
 14
 Under Michigan law, a plaintiff who claims to have been fraudulently induced to enter into a contract for the purchase of stock may elect to pursue one of two theories of recovery--the plaintiff may rescind the stock purchase, tender back the stock received, and recover his or her investment plus interest, or the plaintiff may affirm the contract for the purchase of the stock, retain the stock received, and sue for benefit of the bargain damages resulting from the fraudulent misrepresentations, measured by the difference between the actual value of the stock received by the plaintiff and the value the stock would have possessed had the representations been true. See D'Alessandro v. Vander Hooning, 365 Mich. 66, 112 N.W.2d 114 (1961); Chatfield v. Sintz-Wallin Co., 182 Mich. 689, 148 N.W. 797 (1914). See also Nationwide Motorist Assn. of Michigan v. Freeman, 405 F.2d 699 (6th Cir.1969). Certain prerequisites must be fulfilled before a plaintiff may elect rescission; upon discovery of the fraud plaintiff must seasonably assert rescission, tender back what has been received, and demand repayment of the purchase price. Gloeser v. Moore, 283 Mich. 425, 278 N.W. 72 (1938). If these conditions are not timely met, the right to rescind is waived and plaintiff must proceed on the contract. D'Alessandro, 365 Mich. at 73, 112 N.W.2d at 118; Paquin v. VanHoutum, 343 Mich. 111, 72 N.W.2d 169 (1955).
 
 
 15
 In paragraph II of the second amended complaint, plaintiffs asserted a claim for fraudulent misrepresentation by defendant Moses. The alleged misrepresentations were that plaintiffs could purchase stock in SMS in blocks at $25.00 per share, "with a block of stock consisting of two hundred (200) shares comprising two and one-half percent (2 1/2%) of the total capital of SMS, Inc." Plaintiffs state that these representations were untrue because the actual selling price of bona fide shares of stock in SMS was $50.00 per share. On the basis of the actual selling price, defendants claim that plaintiffs own shares in one half the amount of plaintiffs' claimed 2500 shares. Plaintiffs sought damages in paragraph II based on the difference "between the present value of the bona fide number of shares they actually own and the value that their interest would have been had the false representations been true," together with punitive damages. Plaintiffs appear by this claim in paragraph II to be proceeding on a theory of fraudulent misrepresentation in inducing a contract, i.e., that they are in fact shareholders of SMS but, due to the alleged fraudulent misrepresentations, do not have the number of shares to which they would be entitled had defendant Moses's representations been true. Thus, it would appear that plaintiffs were seeking damages in paragraph II under Michigan's "benefit of the bargain," measure of damages.
 
 
 16
 In contrast, in paragraph III of the complaint, plaintiffs alleged that defendant Moses fraudulently executed stock certificates which were never authorized by the corporation and which were "not bona fide certificates of stock in the defendant corporation." Plaintiffs asserted in paragraph III that they suffered the loss of value of the shares and sought damages in an amount "equal to the present value of the common shares said documents purport to represent." It arguably appears that plaintiffs by this claim were proceeding on a theory that they are not shareholders of SMS and were seeking damages based upon the value the shares would have at the time of trial if they had owned such shares.
 
 
 17
 Thus, plaintiffs have contended in this action, on the one hand, that they are not shareholders because they did not receive valid certificates of stock and, on the other hand, that they are shareholders entitled to assert a claim for benefit of the bargain damages and also for dissolution of the corporation under Michigan statutes. On appeal, defendants contend that plaintiffs, by disavowing their status as shareholders at the time of trial, "in essence" were seeking to rescind their agreement to purchase SMS stock and that the measure of damages was the amount they paid for the stock plus interest.[4] Yet, defendants themselves made no request for any such jury instruction at the trial, but, instead, sought an instruction based on the "benefit of the bargain" measure of damages. Plaintiffs counter that they "have never pled nor argued the theory of rescission of contract,"[5] and argue that the trial court properly instructed the jury under the benefit of the bargain measure of damages. An additional problem is that under the benefit of the bargain measure of damages, plaintiffs may keep what they received--in this case stock certificates evidencing ownership of SMS stock--but the district judge ordered them to surrender the certificates to defendants and upon surrender," plaintiff's ownership shall cease."[6]
 
 
 18
 We believe that the confusing and conflicting positions of the parties contributed, at least in part, to the erroneous instruction regarding the measure of damages applicable in this case. See discussion infra, III D. Prior to retrial of this action, the district judge should require the parties to commit themselves more definitively to their respective claims, to define the specific issues to be tried as a result of those claims and, if possible, to agree upon the measure of damages under Michigan law to be applied by the jury in light of the respective claims of the parties.
 
 III.
 A.
 
 19
 In their first assignment of error, defendants argue that the trial court should have directed a verdict against plaintiffs because plaintiffs' own evidence established that they were in fact shareholders in SMS and that no fraud occurred. Defendants assert that the trial court failed to apply a basic principle of Michigan corporation law that one who makes a subscription for shares and pays for those shares is a shareholder as a matter of law.[7] In defendants' view, when plaintiffs presented evidence that they (1) communicated a desire to subscribe for SMS stock, (2) tendered payment, (3) received a receipt, and (4) received stock certificates, they proved that they were bona fide shareholders and that no misrepresentations could have occurred in this regard. It is defendants' position that fraudulent misrepresentation about shareholder status regarding stock which has been subscribed and paid for is not possible. The trial court rejected this position in denying defendants' motion for a directed verdict.
 
 
 20
 Defendants are correct that under Michigan law a person is a bona fide shareholder upon subscription and payment for stock, even if his or her name is not recorded on the books of the corporation, Gibson v. Oswalt, 269 Mich. 300, 257 N.W. 825 (1934), or in the absence of delivery or possession of stock certificates. Glass v. Lock, 286 Mich. 628, 282 N.W. 845 (1938); C.M. Hall Lamp Co. v. United States, 201 F.2d 465 (6th Cir.1953). However, this legal rule does not mandate a directed verdict in the present case. First, it was plaintiffs' position at trial that defendant Moses had fraudulently issued "phony" stock certificates, that all authorized, legitimate shares had been issued to others, and that plaintiffs had not been recognized or treated as shareholders of SMS. Second, even assuming that a legitimate and authorized subscription for stock was made in this case and that under Michigan law plaintiffs became shareholders of SMS, this fact would not, in itself, deprive plaintiffs of an action for damages based upon fraudulent misrepresentation in the sale of that stock. As noted earlier, under Michigan law plaintiffs could retain the stock which defendants admit that plaintiffs were entitled to receive (1,250 shares), and obtain benefit of the bargain damages if the jury finds that defendant Moses fraudulently misrepresented that they would receive 2500 shares. The Court finds defendants' first assignment of error without merit.
 
 B.
 
 21
 Defendants' second assignment of error is that the trial court erred in refusing to direct a verdict against the five plaintiffs who did not appear and testify at trial because of their failure to present any evidence that would establish a prima facie case of fraudulent misrepresentation as to them.[8] According to defendants, these non-testifying plaintiffs introduced no evidence that any representations were made to them, that the representations were false, or that they relied on any representations.
 
 
 22
 In reviewing the propriety of a grant or denial of a motion for a directed verdict, this Court applies the same standard used by the trial court.
 
 
 23
 In considering a motion for a directed verdict under Rule 50(a), the trial court 'must determine whether there was sufficient evidence presented to raise a material issue of fact for the jury.' O'Neill v. Kiledjian, 511 F.2d 511, 513 (6th Cir.1975). As applied in this context, 'sufficient evidence' is such that, when viewed in the light of those inferences most favorable to the nonmovant, Galloway v. United States, 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458 (1943), and Dowdell v. U.S. Industries, 495 F.2d 641, 643 (6th Cir.1974), there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable men could differ. Sulmeyer v. Coca-Cola Co., 515 F.2d 835, 841 (5th Cir.1975), cert. denied, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed. 341 (1976), citing 5A Moore's Federal Practice p 50.02 (2d ed. 1974).
 
 
 24
 Sawchick v. E.I. DuPont Denemours & Co., 783 F.2d 635, 636 (6th Cir.1986), quoting Milstead v. Intern. Brotherhood of Teamsters, 580 F.2d 232, 235 (6th Cir.1978), cert. denied, 454 U.S. 896 (1981). A court should grant a motion for a directed verdict only when it is inevitable that a reasonable jury could reach but one conclusion. Bellamy v. Bradley, 729 F.2d 416, 418 (6th Cir.), cert. denied, 469 U.S. 845 (1984).
 
 
 25
 Applying this standard to the case before us, we conclude that the district court properly denied defendants' motion for a directed verdict against the non-testifying plaintiffs. The testimony at trial established that Ilene Moses requested Henry and Helen Hunter to assist her in soliciting investors for her company. Henry Hunter was unequivocal in his testimony concerning the allegedly false representations made to him by Ilene Moses, e.g., that the stock was selling for $25 per share, that investors would receive two and one-half percent of the outstanding shares for every $5000 invested, and that purchasers would receive bona fide SMS stock. To aid the Hunters in recruiting investors, defendant Moses made a "sales pitch" tape recording, the transcript of which does not appear in this record. The testimony at trial established that the sales tape recording was played for plaintiffs Kanuha, Gusek, and Shand.
 
 
 26
 In addition to his testimony regarding the alleged misrepresentations made to him by defendant Moses, Henry Hunter testified that he personally solicited the other plaintiffs to invest in SMS. Plaintiff Novak is Henry Hunter's sister, plaintiff Gusek is Helen Hunter's sister, plaintiffs Kanuha and Shand are Ms. Gusek's roommates, and plaintiff Strauss is Henry Hunter's friend. It is reasonable to infer from Henry Hunter's testimony that the alleged misrepresentations of defendant Moses were passed along to plaintiffs by Henry Hunter either at the request of, or with the approval of, defendant Moses. Moreover, plaintiffs received letters from defendant Moses receipting their investment, at least some of which specifically confirm the alleged misrepresentations concerning the nature of the investment as represented by Henry Hunter. Those letters, signed by defendant Moses, appear to confirm the allegation that representations were made concerning percentages of the outstanding shares of SMS. It may also be inferred that plaintiffs relied on these statements in their purchase of SMS stock. In short, the testimony at trial and the exhibits introduced, considered in the light most favorable to plaintiffs, was sufficient to raise a material issue of fact for the jury and prevent a directed verdict in favor of defendants.
 
 C.
 
 27
 Defendants' third assignment of error is that the trial judge should have directed a verdict against plaintiffs on the basis of their extensive judicial admissions that they are, in fact, SMS shareholders. Specifically, defendants point to such admissions made in the following documents: affidavit in support of preliminary injunction, complaint, first amended complaint, second amended complaint, third amended complaint, brief in support of stay, and final pretrial order.
 
 
 28
 Plaintiffs argue that we should not consider the merits of this argument because it was neither raised in nor considered by the trial court. See Bannert v. American Can Co., 525 F.2d 104 (6th Cir.1975), cert. denied, 426 U.S. 942 (1976). We reject defendants' contention that this argument was raised in their motion for a directed verdict by the statement, "Now, for the first time, we have heard at trial [that plaintiffs' were not shareholders]...." This statement was insufficient to put the trial judge on notice that he was being asked to consider the legal effect of prior statements made by plaintiffs in their pleadings. Nor do we agree with defendants that this is the extraordinary type of case where injustice might otherwise result if the Court declines to consider this issue. See Hormel v. Helvering, 312 U.S. 552, 556 (1941).
 
 D.
 
 29
 Defendants' fourth and final assignment of error is that the trial court erroneously instructed the jury regarding the proper measure of damages. We agree.
 
 
 30
 As noted earlier, plaintiffs repeatedly alleged prior to trial that they were in fact shareholders of SMS. They did so in the first amended complaint,[9] the second amended complaint,[10] and the third amended complaint.[11] In paragraph II of the second and third amended complaints, plaintiffs appeared to be proceeding on the claim that they were in fact shareholders in SMS, but that they received a smaller interest in the company than they were led to believe they would receive due to the false representations of defendant Moses. It seems clear that under this claim, plaintiffs were seeking damages under Michigan's benefit of the bargain rule, i.e., the difference between the actual value of their stock and the value it would have possessed had the representations been true.
 
 
 31
 In contrast, under paragraph III of the second and third amended complaints, plaintiffs appeared to be proceeding on the claim that they were not shareholders in SMS, because their stock was not authorized by the corporation and because defendant Moses fraudulently issued them counterfeit stock certificates. Under this claim, plaintiffs sought a different measure of damages--damages "equal to the present value of the common shares said documents purport to represent."
 
 
 32
 During the discovery phase of the litigation, a dispute arose as to the right of plaintiffs to obtain financial information regarding the present value of SMS. Defendants argued that such information was not relevant to the issue of damages, "since damages in an action of this sort are limited to 'the difference between the actual value of the property at the time of making the contract and the value that it would have possessed if the representations had been true,' " citing D'Alessandro v. Vander Hooning, 365 Mich. 66, 112 N.W.2d 114, (1961).[12] The district judge originally assigned to the case held:
 
 
 33
 The court finds merit in defendants' argument on this issue, and would note that the principle enunicated in D'Alessandro is a long-standing one, and is one which the Michigan Court of Appeals has seen fit to apply in recent years. See Williams v. American Title Insurance Co., 83 Mich.App. 686 (1978); Mayhall v. A.H. Pond Co., Inc., 129 Mich.App. 178 (1983). Thus the court will not order the compulsion of discovery on this ground.[13]
 
 
 34
 In reliance on this ruling, defendants filed, prior to trial, a motion in limine seeking to exclude evidence regarding the present value of SMS, and on the morning of trial the district judge who tried the case heard argument on this question. Defendants argued, citing D'Alessandro and the discovery ruling made by the judge's predecessor, that the present value of SMS was irrelevant because the measure of damages in a fraudulent misrepresentation case is the difference between the actual value of the stock on the date of the transaction and the value of the stock at that time as represented by defendants. Plaintiffs argued that the measure of damages under D'Alessandro is the difference between the actual value of the stock on the date of the transaction and the value the stock would have had if the representations had been true at the time that the damages are assessed. The trial judge denied the motion in limine, "because this court feels that this is a common law fraud action and the value is one that can be established at the time of trial."[14] Despite this ruling, during the voir dire examination of prospective jurors, the judge stated that the action "involves the purchase of certain stock from the defendants and there is a dispute as to what the value of that stock was at the time of purchase."[15]
 
 
 35
 It appears clear from plaintiffs' counsel's opening statement that plaintiffs at trial abandoned the claim that they were shareholders in SMS and were entitled to benefit of the bargain damages, as they had previously alleged in paragraph II of the amended complaints. Rather, plaintiffs' claim at trial was that they were not sold bona fide shares of stock. Plaintiffs nevertheless contended at trial that the measure of damages to be applied was the benefit of the bargain measure of damages.[16]
 
 
 36
 In his closing argument on the subject of damages, plaintiffs' counsel argued that the value of the stock plaintiffs received was zero; that if they had received bona fide SMS stock, as represented and in the percentages represented, they would have owned 31.25% of SMS; and that based upon the $4,900,000 present value of SMS, plaintiffs should recover damages in the amount of $1,500,000. Defendants' counsel argued that plaintiffs were bona fide shareholders of SMS, although not for the number of shares their certificates purported to represent. According to defendants' counsel, the Hunters owned 400 shares for their $20,000 investment and the other plaintiffs owned 850 shares for their $42,500 investment. Pointing out that the question of cancellation of certificates mistakenly issued would be a question for the court and not for the jury, defendants' counsel argued that plaintiffs had suffered no real damage.
 
 
 37
 The only instruction given to the jury on the issue of damages was as follows:
 
 
 38
 The victim of a fraudulent misrepresentation is entitled to recover damages equal to the difference between the actual value of what the plaintiffs purchased at the time of trial and the value it would have possessed if the representations of the defendants had been true.
 
 
 39
 If you find that the voluntary acts or conduct of the defendants caused feelings of humiliation, outrage, and indignity, and that the defendant acted in a willful and wanton manner as to demonstrate a reckless disregard of plaintiffs' rights, then you may include compensation for plaintiffs' feelings of humiliation, outrage, and indignity as part of the damages.[17]
 
 
 40
 No challenge is raised on appeal regarding the instruction on punitive damages.
 
 
 41
 Before turning to the specific language of the instruction on damages, we consider, in light of the confusing and contradictory claims made by plaintiffs and their position at trial that they were not shareholders, whether the benefit of the bargain measure of damages was appropriate in this case in the first instance.
 
 
 42
 In actions based upon fraud in inducing a party to enter into a contract for the purchase of property, the courts are not in accord as to the proper measure of damages to be applied. In some jurisdictions it is held that in this type of action the proper measure of damages is what the plaintiff actually lost "out of pocket" as a result of the fraud, i.e., the difference between what plaintiff paid as the purchase money and the actual value of what he or she received in return. In other jurisdictions the plaintiff is not as limited in his or her recovery. If the value of what plaintiff contracted to receive exceeds plaintiff's purchase money, he or she can recover the difference between the value of the property as it had been represented and its actual value. In this manner plaintiff recovers the "benefit of his bargain."[18] As noted earlier, Michigan law permits recovery of damages in fraudulent misrepresentation actions under this benefit of the bargain measure of damages.
 
 
 43
 The Michigan cases applying the benefit of the bargain damages rule have generally involved parties who have entered into enforceable contracts, but the defendant fraudulently misrepresented the value of what plaintiff was to receive under the contract. In that case, if fraud is established, a plaintiff under Michigan law has an option. The plaintiff may rescind the contract and recover back what was paid, or the plaintiff may affirm the contract, keep what was received, and recover as damages the difference between the actual value of what was received and the value it would have possessed if the fraudulent misrepresentations had been true--the benefit of the bargain. D'Alessandro, supra.
 
 
 44
 In the present case, plaintiffs at different stages of the litigation had repeatedly affirmed the existence of a valid contract, i.e., their purchase and receipt of stock from defendant Moses and their status as shareholders. In the event, however, that they did not in fact own the full number of shares they believed they had purchased, they sought to hold defendants liable for the difference in value between what they actually received and what they would have received if Ms. Moses' representations had been true--the benefit of their bargain. In defending on that theory, defendants did not contest plaintiffs' status as shareholders, but contested only the number of shares plaintiffs should have received (1250) as opposed to the number of shares plaintiffs claimed they purchased (2500).
 
 
 45
 At the start of the trial, however, plaintiffs abandoned their claim that they were shareholders. They no longer affirmed the purchase contracts for the SMS stock and no longer claimed to be owners of a disputed number of shares of stock. Their contention at trial was that they received no stock in return for their investments, in part because all the authorized shares of stock in SMS had already been sold. At trial, plaintiffs did not claim either a rescission of the purchase contracts and recovery back of their purchase money or affirmation of the purchase contracts, retention of the stock, and benefit of the bargain damages.[19]
 
 
 46
 If plaintiffs had sought to affirm the contract for the purchase of stock, keep the stock obtained, and recover damages based upon misrepresentations as to the number of shares to which they were entitled or the value of those shares, then clearly, under Michigan law, the benefit of the bargain measure of damages would be applicable. As noted, however, their position at trial was that defendants--and more specifically Ilene Moses--had induced them to invest money based upon Moses' false representations that plaintiffs would receive shares of stock in SMS when in fact they received nothing in return but worthless scraps of paper. Plaintiffs were thus not seeking to affirm any contract for the purchase of stock since they disavowed the existence of any enforceable contract. In essence, plaintiffs' claim at trial was that defendant Moses had obtained their money by fraudulent misrepresentations in return for which they received nothing. Under such a claim, analogous to rescission of a purchase agreement for failure of consideration, plaintiffs clearly would be entitled to the return of their purchase money as compensatory damages and also to punitive damages for the fraud.[20] It is interesting to note that the jury's verdict in this case seems to reflect exactly this type of damage award; each plaintiff was awarded an amount exactly equal to his or her purchase money, multiplied by ten.
 
 
 47
 Although we have raised a question regarding the applicability of the benefit of the bargain measure of damages under the unusual nature of this case and plaintiffs' conflicting claims and contentions, the parties themselves did not object to the court's benefit of the bargain instruction on this ground. Defendants did object to the court's damages instruction on the ground that it permitted the jury to consider the value of the stock at the time of trial rather than its value at the time of the purchase transaction.[21] On appeal, defendants contend that not only did the trial judge's instruction fail to accurately state Michigan law in this respect, it also was in direct conflict with the pretrial ruling by the judge's predecessor that, under D'Alessandro, the present value of the stock was not relevant to the damages issue.
 
 
 48
 Assuming that the benefit of the bargain measure of damages was applicable, it appears to us that the instruction as given was not a correct statement of the Michigan law on this measure of damages. D'Alessandro, a leading Supreme Court of Michigan decision on this question, involved a contract between plaintiffs and defendant for the purchase of a restaurant business through the plaintiffs' purchase of the stock of the owner corporation from defendant. Plaintiffs subsequently discovered that defendant had made false representations regarding the success of the business, as well as other facts. Upon finding that plaintiffs had been induced to enter into the contract by the fraudulent misrepresentations of the defendant, the trial court awarded plaintiffs a judgment that included the difference between the value the stock would have had if the representations had been true and the actual value of the stock at the time of the purchase transaction. In finding this award to be proper, the Supreme Court of Michigan stated:
 
 
 49
 By proceeding under the contract after discovery of the actual situation and the falsity of the representations made, they waived their right to rescind. In consequence, we have a suit to recover damages the measure of which is "the difference between the actual value of the property at the time of making the contract and the value that it would have possessed if the representations had been true." 24 Am.Jur., Sec. 227, p. 55. In accord with the general rule are prior decisions in Michigan relating to the matter. Among the cases recognizing such rule are: Chapman v. Bible, 171 Mich. 663, 137 N.W. 533, 43 L.R.A., N.S., 373; Gloeser v. Moore, 283 Mich. 425, 278 N.W. 72; Paquin v. VanHoutum, 343 Mich. 111, 72 N.W.2d 169.
 
 
 50
 D'Alessandro, 365 Mich. at 73, 112 N.W.2d at 118 (emphasis added).
 
 
 51
 In contrast, the trial court in this case instructed the jury:
 
 
 52
 The victim of a fraudulent misrepresentation is entitled to recover damages equal to the difference between the actual value of what the plaintiffs purchased at the time of trial and the value it would have possessed if the representations had been true.
 
 
 53
 (Emphasis added). Thus, with respect to the first part of the benefit of the bargain formula, the actual value of the shares, the trial judge erroneously instructed the jury to make its actual value determination not at the time of the transaction when the fraudulent misrepresentations were made, but years later at the time the trial was being held.
 
 
 54
 Plaintiffs contend on appeal that any such error was harmless, because it was their position at trial that the actual value of what they received at the time of the transaction was nothing. This ignores the fact that defendants' position at trial was that at the time of the purchase transactions plaintiffs received valuable stock, but not in the amount plaintiffs contended they were to receive. In short, the evidence was sharply in conflict as to the actual value of the stock at the time of the transactions in question. How the jury arrived at its verdict is obviously unknown; it is known, however, that the damage instruction did not accurately state Michigan law concerning a determination of actual value at the time of the purchase agreements under the benefit of the bargain measure, and we cannot say it was harmless error under the circumstances of this case.
 
 
 55
 With regard to the determination of the second part of the benefit of the bargain formula--the value of the shares as represented--the trial court's instruction is, at best, ambiguous. It incorporated, virtually verbatim, the language in D'Alessandro:
 
 
 56
 the value it would have possessed if the representations of the defendants had been true.
 
 
 57
 The unanswered question, of course, is at what point in time the represented value should be measured, whether at the time of the transactions or at the time of trial. Defendants argue that the represented value, as well as the actual value, must be determined at the time of the transactions, as they set forth in their requested instruction. Plaintiffs contend that to have so instructed the jury "would have defeated the purpose of the 'benefit of the bargain rule,' allowing defendants to profit from their fraud as they did here and frustrating the expectations of the victims of the fraud."[22]
 
 
 58
 A strong argument can be made in a case in which the benefit of the bargain measure of damages is applicable that the correct point in time at which to measure represented value is normally the time when the transaction occurred, i.e., when the bargain was made. In such a case, the plaintiff elects to affirm the contract and to retain what was received, but he or she is permitted to recover as damages the value of what he or she bargained to receive at that time based on the representations of the defendant. The critical point is the time the bargain was made and not what occurred at some later point in time to either increase or decrease the value of the property which plaintiff retains under his or her affirmance of the contract. For example, a person purchasing stock at $100.00 per share, based upon the false representations of a defendant, when the stock's actual value at that time was $50.00 per share, should be allowed to recover the difference in those values. If subsequent events in the company's operations reduce the actual value of the stock further, the plaintiff should not recover the difference between the represented value at the time of sale and its current actual value. Conversely, if subsequent events in the company's operations result in the stock at some later date being worth as much as plaintiff paid for it, this would not, under the benefit of the bargain approach, prevent plaintiff from recovery of damages for the false representations. Gloeser v.Moore, 283 Mich. 425, 278 N.W. 72 (1938); Chapman v. Bible, 171 Mich. 663, 137 N.W. 533 (1912). What occurs after the bargain was made is thus not normally relevant to the representation made at the time of the bargain regarding the value of the stock at that time. This, apparently, was the ruling of the trial judge's predecessor in this case. It also is consistent with the decision of the Supreme Court of Michigan in D'Alessandro in which the court disallowed, as a part of plaintiffs' damages, losses of the business occurring after the bargain was made:
 
 
 59
 Under the proofs in the case at bar it may not be said that the value of the corporate stock which plaintiffs purchased was affected, at the time of the transaction, by the subsequent losses sustained by them in conducting the restaurant business under the name of Van's Howard Johnson, Inc. The misrepresentations constituting the basis of plaintiffs' action for damages concerned the value of the stock at the time and were made, as plaintiffs claimed, for the purpose of inducing the purchase. An additional claim for damages because of loss of profits or losses subsequently sustained in operations may not be allowed. Damages of such nature are not within the purview of the rule applicable in cases of this character.
 
 
 60
 D'Alessandro, 365 Mich. at 78, 112 N.W.2d at 120.
 
 
 61
 In Gloeser v. Moore, supra, plaintiff alleged fraud in the sale of syndicate certificates in an oil company. Although there was some uncertainty as to whether plaintiff was seeking rescission of the contract and return of his purchase money or affirmation of the contract and damages based on the false representations, the Court concluded that the latter claim was being made. Plaintiff's motion for summary judgment was denied because, "[p]resumably, he had no knowledge of what the value of the certificates was or what the difference in value was between what they were represented to be worth and what they actually were worth at the time the stock was sold to him. This was the measure of damages on affirmance of the contract." Id., 283 Mich. at 433, 278 N.W. at 75. The defendants opposed the plaintiff's motion on the ground, inter alia, that the company's current financial condition was good and that plaintiff's certificates were worth as much as he had paid for them and hence plaintiff "had lost nothing through his purchase." 283 Mich. at 433, 278 N.W. at 75. The Supreme Court of Michigan answered this contention as follows:
 
 
 62
 The fact that defendant syndicate was the owner of producing oil wells at the time the affidavits of merits were executed had no bearing upon the question of the value of defendant's properties at the time the fraud was alleged to have been perpetrated, more than two years prior thereto. The measure of damages in such cases is the difference between the value of the stock as it was represented to be and what it was actually worth at the time of purchase.
 
 
 63
 283 Mich. at 433-34, 278 N.W. at 75.
 
 
 64
 In Daviter v. Ash, 264 Mich. 353, 249 N.W. 886, (1933), the Supreme Court of Michigan, in an action for damages for fraud in the sale of securities said:
 
 
 65
 The measure of damages in such case is the difference at time of sale in value of the securities as they were represented and as they were. (Emphasis ours).
 
 
 66
 Later Michigan cases have also applied benefit of the bargain measures of damages as of the time of the fraudulent misrepresentations that induced the party to enter into a contract, see, e.g., Newton Realty Co. v. Fileccia, 20 Mich.App. 674, 174 N.W.2d 603 (1970), but the Michigan lower court cases do not appear to be entirely consistent in this regard. See, e.g., Gorman v. Soble, 120 Mich.App. 831, 328 N.W.2d 119 (1982) (appearing to apply a determination of values as of the time of trial); Williams v. American Title Insurance Co., 83 Mich.App. 686, 269 N.W.2d 481 (1978) (implying a determination of values when discovery of the misrepresentation occurs).
 
 
 67
 We conclude that the instruction on damages given in this case, assuming that the benefit of the bargain measure of damages was applicable, was both erroneous and ambiguous--erroneous in that it incorrectly stated that the actual value of what plaintiffs purchased was to be determined at the time of trial and not at the time of the purchase, and ambiguous in that it did not clearly state whether the represented value was to be determined at the time of the purchase or at the time of the trial. The verdict of the jury does not appear to comport with the trial court's instructions but, instead, appears to be a verdict arrived at by simply multiplying by ten times the plaintiffs' investments. While we do not, of course, reverse for this reason, it is indicative to us that the jury could well have reached a verdict in this case because of an erroneous and ambiguous instruction on the measure of damages.
 
 
 68
 Our holding on the state of the Michigan law of damages can be summarized briefly. Plaintiffs may recover on the theory that they bought actual shares as a result of fraudulent misrepresentations; or, they may recover on the theory that they did not become shareholders of the company because of wrongdoing by the defendants. They cannot recover on both theories, though they may advance their case on both theories until judgment, so long as the necessary prerequisites to each theory are kept separate and distinct.
 
 
 69
 Under the "not shareholders" theory, they could be entitled to return of their purchase price, or to receipt of the shares they had been denied. If they are entitled to recovery on a fraudulent misrepresentation theory, there are also two possible measures of damages. One measure is the amount paid. Under this measure, the plaintiffs would be entitled to rescind the transaction and recover back the amount paid, regardless of the actual value of the stock at the time of the transaction (or at any time later). The second measure is based on the benefit of the bargain. Under this measure, plaintiffs could recover damages based on the difference between the amount they paid and the amount the stock would have been worth had the misrepresentations been true at the time of the transaction.
 
 
 70
 The only theory under which plaintiffs are entitled to a portion of the value of the corporation at the present time is the first theory: that they were wrongfully prevented from obtaining the status of shareholders, to which they are currently entitled. If, on the other hand, they did become shareholders, though induced by whatever type of misrepresentation, then the measure of damages is fixed as of the time of the sale. Normally, if the stock is simply worth less than the purchase paid, but there was no representation that the stock was worth more than the amount paid, rescission and repayment of the purchase price would be the preferred remedy. If, however, the stock was represented to be worth considerably more than the purchaser paid, "benefit of the bargain" damages are generally chosen, to reflect the difference in value which plaintiff was denied by the misrepresentations.
 
 
 71
 We would suggest that should all theories be pursued to conclusion on a second trial the jury be instructed by special interrogatories to determine:
 
 
 72
 (1) whether plaintiffs in fact became shareholders as of the time of the initial transactions;
 
 
 73
 (2) if they did not become shareholders, of how many shares, if any, were they wrongfully deprived of ownership;
 
 
 74
 (3) if they did become shareholders, are there any rights of shareholders of which they are presently being deprived;
 
 
 75
 (4) if they are currently shareholders, and that status was induced by fraudulent representations, plaintiffs should be required, before going to the jury, to choose a theory of damages: rescission and return of the purchase price, or affirmation and receipt of the benefit of the bargain, (note that punitive damages may be available in either case);
 
 
 76
 (5) if the benefit of the bargain is chosen, the jury must provide the value of the shares at the time of the transaction, had the misrepresentations been accurate.
 
 
 77
 This analysis is somewhat complicated by the fact that it is at least conceivable that the two separate theories might each apply to a portion of the transaction. To the extent plaintiffs claim that:
 
 
 78
 (1) they did become holders of 1250 shares, when it had been represented to them that they would become holders of 2500 shares; and
 
 
 79
 (2) the shares they did receive were represented to be worth more than they in fact were, then different theories could apply to each of these two parts.
 
 
 80
 With regard to the 1250 shares that it might develop they never received, they could proceed under the "not shareholders" theory. With regard to the 1250 shares they did receive (on one view of the evidence) the shares might have been represented to be worth much more (on a per share basis) and thus they could elect either to rescind, or to receive benefit of the bargain damages.
 
 
 81
 If these distinctions are clearly made on retrial, the jury should then be able to determine appropriately what damages, if any, are due plaintiffs.
 
 
 82
 It is apparent to us that the jury included both compensatory and punitive damages in its award to the plaintiffs or, at the least, it was instructed that it could do so. Because we believe that the issue of damages, both compensatory and punitive, is so inextricably intertwined with the other issues in this case, and because we believe that the jury was improperly instructed on the damages issue, we reverse the judgment of the trial court on the jury's verdict and remand this case for a new trial.
 
 IV.
 
 83
 Finally, plaintiffs cross-appeal the decision of the predecessor of the trial judge to abstain from hearing their claim for dissolution of SMS.
 
 
 84
 The doctrine of abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." Colorado River Water Cons. District v. United States, 424 U.S. 800, 813 (1976) (citations omitted). The mere fact that a state court may entertain an action does not justify a federal court's decision to dismiss that action in favor of a state proceeding. Id. at 813-14.
 
 
 85
 In Colorado River, the Supreme Court recognized three categories of cases in which abstention may be proper. Roughly defined, those categories include (1) cases presenting a federal constitutional question which might be mooted by a state determination of state law; Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496 (1941), (2) cases deferring to state resolution difficult state law questions involving important public policy considerations; Burford v. Sun Oil Co., 319 U.S. 315 (1943), and (3) cases seeking to restrain state criminal proceedings, collection of state taxes, and the like; Younger v. Harris, 401 U.S. 37 (1971); Ada-Cascade Watch Co., Inc. v. Cascade Resource Recovery, Inc., 720 F.2d 897 (6th Cir.1983).
 
 
 86
 Although the district judge did not specify which abstention doctrine he relied upon in reaching his decision, the parties agree that the apparent basis of the decision is the Burford doctrine. Before a case may be dismissed on the basis of Burford, two prerequisites must be satisfied: (1) the presence of a complex state regulatory scheme which would be disrupted by federal court review, and (2) the existence of a state-created forum with specialized competence in the area. Burford, 319 U.S. at 327, 332-33; Ada-Cascade Watch Co., Inc., 720 F.2d at 903. Federal courts are particularly careful to avoid interference when the subject is one of substantial state concern and is part of a statutorily established regulatory program. Ada-Cascade Watch Co., Inc., 720 F.2d at 903. To justify abstention, "[i]t is enough that exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." Colorado River, 424 U.S. at 814.
 
 
 87
 We have little difficulty in finding that the State of Michigan has enacted a comprehensive legislative scheme governing businesses which elect to incorporate in that state. Mich.Comp.Laws Ann. Secs. 450.62, et seq., 450.1101, et seq. The state has a substantial and overriding interest in the regulation of corporations seeking the benefits and protections of its laws and the privilege of doing business within its borders. The state should be permitted to exercise control over the internal affairs of its domestic corporations free from interference by federal courts, particularly where the issue is whether the corporation should be permitted to continue in existence or be dissolved. Moreover, the legislature has provided a forum with specialized competence in the areas of internal corporate matters. Jurisdiction over corporate dissolution rests exclusively with the circuit court of the county in which the registered office of the corporation is located. Mich.Comp.Laws Ann. Sec. 450.1825(1).
 
 
 88
 We find that in this particular case the dissolution of the domestic corporation in question was a matter of substantial interest to the state and, in the interest of comity, it was appropriate for the district court to abstain from deciding plaintiffs' claim for dissolution of SMS.
 
 V.
 
 89
 For the reasons stated, the judgment of the district court on the jury's verdict is REVERSED and the case is REMANDED for a new trial. The judgment of the district court dismissing, on abstention grounds, plaintiffs' claim for a dissolution of SMS is AFFIRMED.
 
 
 
 *
 The Honorable John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 The claim seeking a dissolution of the corporation is referred to in the record as "Count III" of the third amended complaint
 
 
 [2]
 The dismissal of the claim for breach of a shareholders' agreement is not an issue in this appeal
 
 
 [3]
 Defendants-Appellants' Brief, p. 11
 
 
 [4]
 Defendants-Appellants' Brief, pp. 38-39
 
 
 [5]
 Plaintiffs-Appellees' Reply Brief, p. 23
 
 
 [6]
 Joint Appendix, Vol. 1, p. 90
 
 
 [7]
 Mich.Comp.Laws Ann. Sec. 450.1315(2) provides in relevant part:
 ... when payment of the full consideration for which shares are to be issued is received by the corporation, the subscriber has all the rights and privileges of a holder of such shares, including registration in his name of a certificate representing them and the shares shall be fully paid and nonassessable....
 
 
 [8]
 In Disner v. Westinghouse Electric Corp., 726 F.2d 1106, 1111-12 n. 11 (6th Cir.1984), we set forth the elements required by Michigan law to prevail on a claim of intentional fraud:
 (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.
 
 
 [9]
 "The plaintiffs herein are the bonafide owners of 2,350 fully paid shares of common stock of the Defendant corporation." Joint Appendix Vol. I, p. 101
 
 
 [10]
 As noted earlier in this decision, paragraph II alleged the purchase of 2,500 shares at $25.00 a share. Joint Appendix Vol. I, p. 80
 
 
 [11]
 In addition to incorporating the allegations of the second amended complaint, plaintiffs alleged that they were minority shareholders of the corporation and sought either a dissolution of the corporation or to have their shares purchased at their fair market value pursuant to MCLA 450.1825. Joint Appendix Vol. I, pp. 86-88
 
 
 [12]
 R.Vol. 5, Opinion dated September 28, 1984 at p. 2
 
 
 [13]
 Id. at pp. 2-3. The Court did, however, require the production of such information as relevant "for the purpose of establishing a circumstantial and motivational basis for the element of 'intent' which is requisite to a showing of fraudulent misrepresentation." Id. at 3
 
 
 [14]
 Tr.Vol. I, p. 10 (emphasis added)
 
 
 [15]
 Tr.Vol. I, p. 17 (emphasis added)
 
 
 [16]
 In counsel's opening statement he stated:
 But in Michigan, for fraud, we calculate the measure of damages as being the value of what it is someone bought at the time they bought it, the difference between that value and the value it would have had if the misrepresentation was true. In this case, we are going to prove to you that the value of what they bought at the time they bought it, which was essentially phony stock certificates was zero.
 Tr.Vol. I, p. 49.
 
 
 [17]
 Tr.Vol. 5, p. 144 (emphasis added)
 
 
 [18]
 Annotation, "Out of Pocket" or "Benefit of Bargain" As Proper Rule of Damages For Fraudulent Representations Inducing Contract for the Transfer of Property, 13 A.L.R.3d 875 (1967)
 
 
 [19]
 Plaintiffs claim that there was no enforceable subscription agreement that would have made them stockholders under Michigan law. Plaintiffs-Appellees' Reply Brief, p. 17
 
 
 [20]
 In Woolenslagle v. Runals, 76 Mich. 545, 553-54, 43 N.W. 454, 457 (1889), the Court said:
 There are cases where, undoubtedly, the measure of damages would be the difference in value between the property obtained as it actually is and what it is represented to be; but here nothing was obtained. There was an entire failure of consideration, and she had been induced to part with the title and possession of it by these false and fraudulent representations.
 
 
 [21]
 Defendants requested the following instruction, which the trial court refused to give:
 
 
 [13]
 If you find for Plaintiffs in accordance with these instructions, then you must determine the damages to which they are entitled. Damages are arrived at by determining the difference between the value of the stock as represented to the Plaintiffs and the actual value Plaintiffs received at the time they purchased their stock
 If you find by clear and convincing evidence that Plaintiffs were fraudulently induced to believe that they were purchasing shares of stock at $25 per share, then they were entitled to 2,500 shares for their $62,500 invested and your verdict will so state.
 
 
 [22]
 Plaintiffs-Appellees' Reply Brief, p. 27